**NATIONAL POOL BUILDERS, INC., Plaintiff,**

v.

**SUMMIT NATIONAL BANK, Defendant and Third-Party Plaintiff, Respondent,**

v.

**Richard A. ZAPPA, et al., Third-Party Defendants, Appellants.**

No. 48443.

Supreme Court of Minnesota.

June 15, 1979.

George C. Gubbins, Jr., Deephaven, Thomas J. Stearns, St. Paul, for appellants.

Briggs & Morgan, David C. Forsberg, and Bonnie L. Berezovsky, St. Paul, for respondent.

Heard before ROGOSHESKE, PETERSON, and KELLY, JJ., and considered and decided by the court en banc.

PETERSON, Justice.

Appellants, Richard Zappa, Diana M. Zappa, Neil Wichterman, and Peggy Wichterman, claim that defendant, Summit National Bank, breached an agreement to lend $50,000 to RAZ Enterprises, Inc., d. b. a. Viking Swimming Pool Company and Recreational Supply (hereafter RAZ), an enterprise run by Richard Zappa and Neil Wichterman,[1] and wrongfully dishonored a check for $11,818.75 issued by RAZ, thereby damaging appellants in various ways. Appellants now appeal from the directed verdict granted defendant by the trial court.[2] We affirm.

In 1970, Richard Zappa incorporated RAZ. In the fall of 1971, he and Neil Wichterman decided to go into the swimming pool business and, in so doing, they set up a division of RAZ called Viking Swimming Pool and Recreational Supply Company. This business also sold snowmobiles and bicycles. James R. Bolin, an insurance agent-realtor, was invited to RAZ meetings starting in February or March of 1972, to help the corporation locate necessary outside financing. The initial meeting between the members of RAZ and defendant regarding the obtaining of working capital occurred in July 1972. Bolin introduced Wichterman and Zappa to Robert Heck, who was a commercial loan officer of defendant. One of plaintiffs' two causes of action is that at one of these meetings Heck, on behalf of defendant, agreed to lend RAZ $50,000, a commitment defendant denies making. Defendant argues it agreed to lend and in fact did lend RAZ a lesser amount,

1. Diana M. Zappa is the wife of Richard A. Zappa. Peggy Wichterman was the wife of Neil Wichterman at the time of the alleged wrongful acts by defendant. Neither Diana Zappa nor Peggy Wichterman took any part or played any role in the business of RAZ Enterprises, Inc., d. b. a. Viking Swimming Pool Company and Recreational Supply.

2. The present appeal arose out of an action instituted by National Pool Builders, Inc., against Summit National Bank, based on Summit's refusal to honor the $11,818.75 check issued by RAZ and payable to National Pool. Summit commenced a third-party action against Richard A. Zappa, Diana M. Zappa, Neil Wichterman, and Peggy Wichterman. The Zappas and the Wichtermans counterclaimed against Summit. Summit settled with National Pool and dismissed its third-party claim. The matter went to trial only on the counterclaim of the Zappas and the Wichtermans against Summit. To avoid confusion at trial, the Zappas and Wichtermans were referred to as plaintiffs. We will likewise call them plaintiffs here.

Plaintiffs' other contention involves the refusal of defendant to honor a check for $11,818.75 issued by RAZ. RAZ ordered from National Pool Builders, Inc. (hereafter National Pool) on a c. o. d. basis the major portion of its parts, supplies, and swimming pool kits. In April 1973, RAZ obtained five contracts for swimming pools and received a special price on shipping swimming pool kits from National Pool. To pay for these, RAZ needed $11,818.75. RAZ issued a check for $11,818.75 on April 17, 1973, payable to National Pool. Twice, in June and July 1973, defendant returned the check for insufficient funds to the payee, National Pool. It is undisputed that RAZ did not have sufficient funds in its account with defendant. However, plaintiffs argue defendant wrongfully dishonored the check because they claim Heck told Zappa and Wichterman that when this check was received for collection, the $11,818.75 would be advanced to the account by defendant. Plaintiffs claim this amount was an installment of defendant's original $50,000 commitment. Heck denied making such an assurance.

RAZ entered into bankruptcy in the fall of 1973, an event plaintiffs claim was caused by defendant's allegedly wrongful acts. Plaintiffs claim they thereby suffered various damages, including the loss of their investment in RAZ, the personal bankruptcies of the Zappas, the collapse of the Wichterman marriage, the disintegration of Neil Wichterman's credit, and legal fees incurred by Richard Zappa and Neil Wichterman in litigation with the creditors of RAZ.

■ 1. A motion for a directed verdict presents a question of law regarding the sufficiency of the evidence to present a fact question for the jury to decide. *Jacoboski v. Prax,* 290 Minn. 218, 187 N.W.2d 125 (1971). The motion should be granted in those unequivocal cases where, in the light of the evidence as a whole, it would clearly be the duty of the trial court to set aside a contrary verdict as being manifestly against the entire evidence. *J. N. Sullivan & Assoc. v. F. D. Chapman Const. Co.,* 304 Minn. 334, 231 N.W.2d 87 (1975). The motion for directed verdict admits for the purposes of the motion the credibility of the evidence for the adverse party and every inference which may be fairly drawn from such evidence. Nevertheless, "a court should direct a verdict in favor of the party in whose favor the evidence overwhelmingly preponderates even though there is some evidence in favor of the adverse party. Not every conflict in the evidence gives rise to a jury question." 304 Minn. 336, 231 N.W.2d 89.

■ Considering the evidence in this case as a whole, it would have been the duty of the trial court to set aside a jury verdict in favor of plaintiffs with respect to their claim that defendant agreed to lend RAZ $50,000. Bolin introduced Zappa and Wichterman to defendant and was present with Zappa and Wichterman at the meeting at defendant's location where presumably the alleged $50,000 commitment was discussed. Nevertheless, he testified that he had no recollection of a discussion at that meeting concerning a $50,000 commitment request. Bolin also could not recall whether that figure was discussed during his meetings with Wichterman and Zappa prior to the first approach to defendant and, despite plaintiffs' contrary assertion, he did not recall that his finder's fee for obtaining an introduction to a bank was based on a percentage of $50,000. Heck denied any commitment to lend the $50,000 and testified that the amount agreed upon by the parties was $20,000. There was no reference to any $50,000 commitment or request therefor in any document in the record. However, there were documents in the record supporting defendant's position. Defendant's "Discount Minutes" contained an entry to the effect that defendant agreed in July 1972 to loan RAZ $20,250 to meet current expenses and to supply operating capital. Likewise, Wichterman and Zappa signed a security agreement and a promis-

sory note on behalf of RAZ, both for the amount of $20,250.[3]

The testimony by plaintiffs themselves was inconsistent and insufficient. At no time during the trial did Zappa testify that defendant made a commitment to lend $50,000 to RAZ. Rather, Zappa testified that he and Wichterman wanted $50,000 for RAZ, but admitted that he could not recall what Heck said in that regard. Zappa also testified that Heck responded to the request for $50,000 by indicating that he preferred to start by providing RAZ with $20,000 and then later evaluating the progress made by RAZ. Wichterman did testify that defendant made a commitment to lend $50,000. However, his credibility was undercut by testimony in his prior deposition, which demonstrated that, even though Wichterman may have believed RAZ needed $50,000, it was unclear defendant made any such commitment. This is illustrated by the following exchange:

"Q. But apparently there was some understanding that the bank would lend you up to a total of $20,000?

"A. Up to $50,000.

"Q. Where does this $50,000 come from?

"A. Because that's what I told Mr. Heck we'd need before the company would be on its feet.

"Q. That's what you told Mr. Heck you would need, but did Mr. Heck ever tell you that the bank would commit themselves to that amount, $50,000?

"A. I think so, yes.

"Q. You think so?

"A. Yes.

"Q. Didn't he, in fact, come back and say that the bank would commit themselves up to $20,000?

"A. He never came back and said what amount that the bank would commit themselves to.

"Q. So you didn't know what amount the bank would commit themselves to?

"A. I figured it would be $50,000 because that's what we originally asked for. We told him what we'd need."

2. We need not determine whether plaintiffs introduced sufficient evidence to raise a question of fact regarding whether defendant wrongfully dishonored the $11,818.75 check, because it is clear that plaintiffs failed to produce sufficient evidence that their claimed damages were proximately caused by defendant's refusal to honor the check.[4] It is doubtful plaintiffs suffered any injury from defendant's dishonor of this check. RAZ received the pool kits for which the check was to be payment, installed pools for various of its customers, and received payments from some of these customers for the pools. However, RAZ was never required to pay the $11,818.75 to National Pool. Additionally, because there is not adequate evidence of any agreement by defendant to lend RAZ $50,000, defendant would have needed to make another loan to RAZ in order to cover the $11,818.75 check, despite the fact RAZ was already having financial problems. Furthermore, defendant presented evidence that it did offer the Wichtermans refinancing designed to cover this check, that the additional security demanded in the refinancing agreement by defendant was proper under banking practices, and that the Wichtermans refused to accept the proposed refinancing.

Nevertheless, plaintiffs argue defendant's refusal to honor the check destroyed the ability of RAZ to deal with pool suppliers, and since RAZ' assets and the assets of its individual members were tied up as security for existing loans from defendant and as investment in the business itself, RAZ was

---

**3.** The $20,250 figure apparently reflected the $20,000 loan plus an additional $250 in discounted interest.

**4.** In their appellant brief, plaintiffs raise an issue of fraud, contending defendant's action in connection with the check was "wilful and fraudulent." Plaintiffs' attorney admitted at

oral argument that this issue was never mentioned to the trial court. Likewise, an examination of the trial transcript demonstrates that the issue of fraud was not tried by the express or implied consent of the parties. We will therefore not consider plaintiffs' allegation of fraud.

forced into bankruptcy. Because plaintiffs' other claims for damages are dependent on the cause of RAZ' bankruptcy, the only element of plaintiffs' contention meriting discussion is their claim that RAZ was forced into bankruptcy by defendant's dishonor of the check.

The evidence demonstrated that RAZ was insolvent throughout its existence. Various RAZ financial statements illustrated that RAZ' liabilities continually exceeded its assets. At bankruptcy, RAZ' liabilities exceeded its assets by approximately $83,000. Plaintiffs did not dispute the fact that RAZ was always financially under water. Zappa admitted under cross-examination that RAZ was insolvent during the entire time it was in business, and plaintiffs' attorney acknowledged the same fact in oral argument before this court. During the operation of RAZ, Wichterman was unable to draw enough income to support his family and was financially dependent on his wife. Zappa testified the problems RAZ had in 1973 were that many types of bills were coming due at once and not enough money was available to pay these bills.

A major reason for the financial problems of RAZ clearly was its entry into the snowmobile business. RAZ incurred substantial finance charges in connection with its purchase of snowmobiles. RAZ paid significant amounts in such finance charges between the fall of 1972 and spring of 1973. At the time it declared bankruptcy, RAZ owed even further amounts for unpaid snowmobile finance charges. Snowmobile sales were poor in the winter of 1972 to 1973, as RAZ was able to sell only 12 of its 64 snowmobiles. Therefore, RAZ had to use swimming pool receipts to pay snowmobile finance charges. Although Zappa testified at trial that he did not believe the snowmobile finance charges RAZ had to pay caused RAZ' bankruptcy, his credibility was undercut by his deposition testimony, in which he stated, "[T]he money that we were making was keeping most of the bills paid until we got with the snowmobiles. I think this was the basic thing that drove us under, the high finance charges. Had we not gone into the snowmobile business, we

probably would have made it." In sum, even if the check had been covered, the evidence indicated the financial problems of RAZ would have continued.

Proof of a causal connection must be something more than merely consistent with a complainant's theory of the case. As this court stated in *E. H. Renner & Sons, Inc. v. Primus,* 295 Minn. 240, 243, 203 N.W.2d 832, 835 (1973):

> "Where the entire evidence sustains, with equal justification, two or more inconsistent inferences so that one inference does not reasonably preponderate over the others, the complainant has not sustained the burden of proof on the proposition which alone would entitle him to recover. It becomes the duty of the trial court to direct a verdict because failing to do so would cause any verdict to the contrary to be based on pure speculation and conjecture."

Under the facts of this case, it would be equally justifiable to find that RAZ' bankruptcy was caused by its continual fiscal insolvency and its entry into the snowmobile business as to accept plaintiffs' contention that RAZ' bankruptcy resulted from defendant's refusal to honor the check.

While there are a number of grounds upon which the trial court's decision could be affirmed, we hold the granting of the directed verdict was correct in this case because plaintiffs did not present sufficient evidence to give rise to a jury question on either of their claims.

Affirmed.